# EXHIBIT F



# City of Harrisonburg

City Hall
409 South Main Street
Harrisonburg, VA 22801

## Meeting Minutes - Final

## Planning Commission

| | | |
|---|---|---|
| **Wednesday, October 8, 2025** | **6:00 PM** | **Council Chambers** |

## 1.   Call To Order

The Harrisonburg Planning Commission held its regular meeting on Wednesday, October 8, 2025, at 6:00 p.m. in the City Council Chambers, 409 South Main Street.

## 2.   Roll Call/Determination of Quorum

Members present: Richard Baugh, Chair; Shannon Porter, Vice Chair; Councilmember Laura Dent; Heja Alsindi; KC Kettler; and Randy Seitz. There is one vacancy. Also present: Thanh Dang, Deputy Director of Community Development; Wesley Russ, Deputy City Attorney; Meg Rupkey, Planner; Nyrma Soffel, Planner; and Anastasia Montigney, Development Support Specialist/Secretary. Adam Fletcher, Director of Community Development, arrived at 6:34 p.m.

Chair Baugh called the meeting to order.

**Present  6 -**  Richard Baugh, City Council Representative Laura Dent, Heja Alsindi, Shannon Porter , Kenneth Kettler , and Randall Seitz

## 3.   Approval of Minutes

### 3.a.   Reapprove Minutes from the September 10, 2025 Planning Commission Meeting

Chair Baugh asked if there were any corrections, comments or a motion regarding the September 10, 2025, Planning Commission minutes.

Vice Chair Porter moved to approve the September 10, 2025, Planning Commission minutes.

Commissioner Seitz seconded the motion.

The motion to approve the September 10, 2025, Planning Commission meeting minutes passed by voice vote (6-0).

**A motion was made by Porter, seconded by Seitz, that this Minutes be approved. The motion carried by a voice vote.**

## 4.   New Business - Public Hearings

**4.a.**    Consider a request from the City of Harrisonburg to rezone 2410 Reservoir Street

Chair Baugh stated the Virginia State and Local Government Conflict of Interests Act requires that I make disclosure, to be recorded in the City records, in any matter in which I am prohibited by law from participating. Therefore, I make the following disclosures:

1. The transaction involved is the item taken up on the October 8, 2025, Planning Commission Agenda as Item 5(b), a request for a rezoning for a property located at 2410 Reservoir Street.
2. My personal interest in this transaction relates to the ethical requirements to which I must adhere as a licensed member of the Virginia Bar.
3. I affirmatively state that I will not vote or in any manner act on behalf of the Planning Commission in this matter.

He then recused himself from the request and left Council Chambers.

Vice Chair Porter read the request and asked staff to review.

Ms. Soffel said the applicant is proposing to rezone a +/- 20,479 square foot parcel from R-3, Medium Density Residential District, to R-5C, High Density Residential District Conditional. The property is addressed as 2410 Reservoir Street and is identified as tax map parcel 81-B-1-B. The subject parcel is owned by the City of Harrisonburg and was made available for residential development through the City's Surplus City Property Disposition for Residential Development program in February 2025.

If approved, the applicant plans to buy the property to construct a single-story building with five (5) efficiency units.

*City Owned Land and Housing*
The 2021 Comprehensive Housing Assessment and Market Study recommended identifying suitable City-owned parcels for affordable and mixed income residential development. The City assessed several vacant city-owned parcels and after determining there was no further public use for these properties established a process to sell the surplus parcels for residential development. Under the program guidelines, offers below the assessed value could be considered if the discount was tied to housing affordability.

Five parcels were listed for sale in February 2025. Applicants were considered based on established evaluation criteria, including readiness/feasibility, experience/qualifications, and community value. Information about the program is available on the City website at <https://www.harrisonburgva.gov/public-land-housing>.

Frank Gordon, Trustee of the Valley Housing Trust, proposed to purchase 2410 Reservoir Street for $74,600, below the assessed value of $108,700, in exchange for creating five housing units

with a 30-year affordability commitment below 80-percent of Area Median Income. The sale is contingent on securing land use approvals and the necessary funding to support development. City Council approved the disposition of the property to Valley Housing Trust following a public hearing held on August 26, 2025 (Public hearing information is available at <https://harrisonburg-va.legistar.com/LegislationDetail.aspx?ID=7523686&GUID=20C99547-581A-4954-83F6-6881A735FD49&Options=&Search=>).

*Proffers*

The applicant has offered the following proffers (written verbatim):

1. Dwelling units on the referenced property shall be one bedroom or efficiency units only.
2. Dwelling units on the referenced property may be occupied by a family or no more than two (2) individuals per unit.
3. A maximum of five dwelling units are permitted.

The conceptual site layout is not proffered.

Regarding proffer number 2, parking regulations require one and a half off-street parking spaces per dwelling unit for one-bedroom multifamily units within the R-3 and R-5 districts, unless the occupancy has been restricted through a proffer with a conditional rezoning. Proffer number 2 reduces the occupancy, allowing for a reduction in the off-street parking spaces to one space for each dwelling unit.

*Land Use*

The Comprehensive Plan designates this site as Mixed Use and states:

> The Mixed Use category includes both existing and proposed areas for mixed use. Mixed Use areas shown on the Land Use Guide map are intended to combine residential and non-residential uses in neighborhoods, where the different uses are finely mixed instead of separated. Mixed Use can take the form of a single building, a single parcel, a city block, or entire neighborhoods. Quality architectural design features and strategic placement of green spaces for large scale developments will ensure development compatibility of a mixed use neighborhood with the surrounding area. These areas are prime candidates for "live-work" and traditional neighborhood developments (TND). Live-work developments combine residential and commercial uses allowing people to both live and work in the same area. The scale and massing of buildings is an important consideration when developing in Mixed Use areas. Commercial uses would be expected to have an intensity equivalent to a Floor Area Ratio of at least 0.4, although the City does not measure commercial intensity in that way. Downtown is an existing area that exhibits and is planned to continue to contain a mix of land uses.

> The downtown Mixed Use area often has no maximum residential density, however, development should take into consideration the services and resources that are available (such as off-street parking) and plan accordingly. Residential density in Mixed Use areas outside of downtown should be around 24 dwelling units per acre, and all types of residential units are permitted: single-family detached, single-family attached (duplexes and townhomes), and multi-family buildings. Large scale developments, which include multi-family buildings are encouraged to include single-family detached and/or attached dwellings.

The proposed development conforms to the Comprehensive Plan adding to the variety of housing types and mixed-income housing in the area. The site of the proposed development has existing bicycle and pedestrian infrastructure along its frontage and is located along Transit Route 02, providing multi-modal access to commercial areas and other amenities.

*Transportation and Traffic*
The Determination of Need for a Traffic Impact Analysis (TIA) form ("TIA determination form") for the proposed rezoning is attached. The TIA determination form indicated that the project would not generate 100 or more new peak hour trips, which is the threshold for staff to require a TIA. Therefore, a TIA was not required for the rezoning request.

Regarding proffer number 3, the existing entrance is in the functional area of the intersection. Staff has determined that the development cannot have more than five dwelling units unless the entrance is relocated to align with the median as a right in/right out. This determination is based on the *Virginia Department of Transportation's (VDOT) Road Design Manual, Appendix F: Access Management Design Standards for Entrances and Intersections,* which defines "low volume commercial entrances" as:

> Any entrance, other than a private entrance, serving five or fewer individual residences or lots for individual residences on a privately owned and maintained road or land uses that generate 50 or fewer vehicular trips per day using the methodology in the Institute of Transportation Engineers Trip Generation.

Virginia Housing Trust desires to keep the entrance at its present location and has proposed a proffer to limit the number of dwelling units to five (5) so that it does not exceed VDOT's threshold for a "low volume commercial entrance."

*Public Water and Sanitary Sewer*
Staff has no concerns with the requested rezoning regarding water and sanitary sewer matters.

*Housing Study*
The City's Comprehensive Housing Assessment and Market Study (Housing Study) places the subject site within Market Type A. Among other things, this Market Type is characterized by high population growth. The study notes that Market Type A has "above median overall access to

amenities such as public transit within walking distance, full-service grocery stores, and multiple parks and recreation facilities." The study also notes that "policies that are appropriate to Market type A areas include an emphasis on increasing density through zoning changes, infill development and housing rehabilitation to maintain the quality of housing."

*Public Schools*
Based on the Weldon Cooper Center report's calculation, this development's proposed five multifamily residential units are estimated to generate four (4) K-12 students at full build-out. According to the School Board's current attendance boundaries, Spotswood Elementary School, Skyline Middle School, and Rocktown High School would serve the students residing in this development.

*Conclusion*
Staff believes that the rezoning request aligns with the City's objectives for affordable housing and is consistent with the Comprehensive Plan. With the applicant's submitted proffers, staff does not believe that there would be any adverse effect to the area and recommends approval of the rezoning request.

Commissioner Seitz said in visiting the site, yesterday, it became apparent that turning left coming out of that property is pretty much impossible and definitely not safe. Will any restrictions stipulating no left turns out of the property be a part of the site plan approval process?

Ms. Soffel said there will not be an Engineered Comprehensive Site Plan if the disturbed area is less than 10,000 square feet, which is what the applicant plans. However, it will be reviewed during the building permit process.

Commissioner Seitz asked what tools does the City have in the interest of public safety to assure that nobody tries to make left hand turns coming out of that property?

Ms. Soffel said several ways that they have been restricted is with signage. I did send a message to Public Works. I did not hear back from them on that yet.

Vice Chair Porter asked if there were any more questions for staff. Hearing none, he opened the public hearing and invited the applicant or applicant's representative to speak to their request.

Frank Gordon, Trustee, Valley Housing Trust, came forward to speak to the request. He said I am the contract purchaser of 2410 Reservoir Street. I would first like to thank Ms. Soffel for an excellent summary of this. There is much I can say about this but, in interest of time, I am going to focus on the rationale for the rezoning with the understanding that I would be happy to expand further if desired and answer any questions you have regarding my request on behalf of the City of Harrisonburg which is the owner of the property. One of the things that I would like to call attention to, that Ms. Soffel did not present, is that there is a large City sewer easement in the first front half of this property which restricts the practical building area of this lot to the front. If it is left

R-3, I could, on behalf of the City, request a reduction in parking. However, if that is done then I would have to show an area that would allow for future expansion of parking, if deemed necessary by the City. If that were required, then there is a minimum width of the access that would have to be behind the building. The building must be forward due to the sewer easement and the parking would have to be behind that. That has a minimum width to that aisle. If the minimum width was constructed, then it would reduce the number of units from five to four. Reducing the number of units would disqualify it for funding under Virginia's Department of Housing and Community Development's (DHCD) guidelines. The recent Shenandoah Planning District Council's (sic) Regional Housing Study recommended using state funds to leverage the limited amount of local funds to provide additional affordable housing in our community. I assume that I do not need to convince anyone on this panel of the need for an expansion of affordable housing. I would be delighted to expand on these comments further and answer any questions that you have. I hope to have an opportunity to respond to any concerns that are brought up.

Vice Chair Porter asked if there were any questions for the applicant.

Commissioner Seitz said I would affirm and acknowledge the need for affordable housing and appreciation of the effort that you and the Valley Housing Trust and the City are trying to make in this regard. It is an intricate dance of you are here on behalf of the City, there is a back and forth to it. Just a simple question, one of the conditions was having the funding in place, is the funding in place? I assume all of the approvals and this sequence of things that has to happen is completed. Is it shovel ready at that point?

Dr. Gordon said yes, as a part of the application I provided proof of funds on hand from Valley Housing Trust to complete this project if additional state sources of funding are not obtained. However, I believe in accordance with the regional housing plan that was brought out by the Central Shenandoah Planning District Council (sic), it would be prudent for me and other people interested in expanding affordable housing in Harrisonburg to take their advice to leverage state funds where possible. My experience, which is not extensive but is not nothing in that arena, suggests that each of these funding organizations wishes to be the very last person to add the last ten dollars that makes a huge project possible. Establishing a capital stack for a project like this is a challenge and on a project of this size, I have to admit to some internal debate over whether that is even necessary. To directly answer your question, if state funding is not pursued or is not obtained, Valley Housing Trust has the funds on hand to complete this project.

Councilmember Dent said the state funding you are going for requires it to be five units and if you had to cut it down to four because of the layout of the zoning it would not qualify, is that what you said?

Dr. Gordon said the Department of Housing and Community Development's program requires a minimum of five units in multifamily projects. If it went to four, it would not qualify to apply for DHCD funding for multifamily affordable housing.

**Planning Commission**                    **Meeting Minutes - Final**                    **October 8, 2025**

Councilmember Dent said, again, threading the needle for where you get the best funding.

Dr. Gordon said I liken it to a series of pieces of swiss cheese which need to be aligned so that you can shoot your pointer laser through it all at one time.

Councilmember Dent said I like what you say about the capital stack. Everybody wants to be the last to fund it.

Vice Chair Porter said Dr. Gordon, it is your intention to apply in the spring when DHCD opens the housing trust fund up again?

Dr. Gordon said that would be the round in which I would apply for. Last year, they had all funds distributed in one round. Based on feedback from a number of stakeholders across the state, they agreed to hold back a small portion of funding for a spring round. Needless to say, that would be a highly competitive round. If I apply to DHCD's Affordable and Special Needs Housing (ASNH) program, that would be the round I would first try for.

Vice Chair Porter asked if there were any more questions for the applicant. Hearing none, he opened the public hearing and invited anyone in the room or on the phone wishing to speak to the request. Hearing none, he closed the public hearing and opened the matter for discussion.

Commissioner Seitz said just an appreciation for Valley Housing Trust and Dr. Gordon being willing to go through the Byzantine process of making something important like this happen.

Commissioner Kettler said I would like to thank the applicant for bringing an affordable housing project before us. I would also like to thank the City certainly for this opportunity. In the absence of some sort of subsidy it makes it a whole lot harder to actually build housing that is affordable. Making it at reduced cost for the land certainly helps. I also appreciate proffer two which permits there to be less parking required. Often times in affordable housing, not quite as much parking is required and that is going to be more cost on the renter.

Vice Chair Porter said I will add to the admiration society. The reason why is because there is nobody else in our community, that I am aware of right now, that is doing this. The types of units that you are building, and the fact that you are making them affordable, is extremely valuable to our community. We need many, many more developments like this. As you have probably heard many times before, Frank, we appreciate the fact that you are stepping into this gap and making this sort of development. I certainly wish you the very best of luck with the ASNH [Affordable and Special Needs Housing] funding cycle. I think that you will have an excellent application.

Commissioner Seitz moved to recommend approval of the request.

Commissioner Kettler seconded the motion.

Councilmember Dent said I just wanted to chime in on the admiration society that I really appreciate a small local developer bringing forward incremental small affordable housing units the way you have been doing. That is great. That is a lot of what we need. We need lots of those and at all scales. The small scale that you are doing has a more homey feel than a public housing approach. Thank you for all you are doing.

Vice Chair Porter called for a roll call vote.

| Commissioner Seitz | Aye |
| Councilmember Dent | Aye |
| Commissioner Alsindi | Aye |
| Commissioner Kettler | Aye |
| Vice Chair Porter | Aye |

The motion to recommend approval of the rezoning request passed (5-0). The recommendation will move forward to City Council on November 12, 2025.

Upon conclusion of this item, Chair Baugh returned to the meeting.

**A motion was made by Seitz, seconded by Kettler, that this PH-Rezoning be recommended for approval to the City Council, due back on 11/12/2025. The motion carried with a recorded roll call vote taken as follows:**

**Yes:** 5 - City Council Representative Dent, Alsindi, Porter, Kettler and Seitz

**No:** 0

**Abstain:** 1 - Baugh

**4.b**     Consider a request to rezone 320 South Main Street

Chair Baugh read the request and asked staff to review.

Ms. Rupkey said due to an error in advertising for the Planning Commission public hearing that was held on July 9, 2025, for the rezoning of the property addressed as 320 South Main Street, a new public hearing must be held for the request. This ensures compliance with notification requirements and provides the opportunity for all interested parties to attend and comment on the request.

There are no changes to the application or to the staff report that was presented on July 9. Please refer to the attached July 9, 2025, staff memorandum for staff's analysis of the rezoning request and recommendation.

The applicant is requesting to rezone a +/- 11,146-square foot property from B-2, General Business District to B-1C, Central Business District Conditional. If the request is approved, the applicant plans to continue operating as an office and commercial building.

The existing structure is approximately 4,670 square feet and has space for twelve tenants. The existing tenants include a variety of office uses. In 1960, the property had a building permit approved for a one-story addition. A note on the permit described that the building could not be

used for commercial uses until 20 parking spaces were provided. Under the current Zoning Ordinance, there are different parking requirements for professional offices and for retail. Professional offices require one space per 300 square feet of gross floor area (GFA) while retail establishments under 10,000 square feet of GFA require one space per 200 square feet of GFA. For any combination of office and retail space, the 4,670 square foot structure would require a minimum of 16 to 24 parking spaces. The B-1 Central Business District has no minimum off-street parking requirements; therefore, rezoning the property would allow additional flexibility for other uses, such as more retail, on the property without requiring additional off-street parking.

The site currently includes a one-way, angled parking lot with 22 delineated parking spaces (which do not meet the Design and Construction Standards Manual's (DCSM) dimensional sizing requirements).  The one-way design does not have an appropriate outlet because the parking lot does not provide a turnaround, and thus, unless there are unused parking spaces, requires people to back out of the parking lot into public street right-of-way. If the site were to be redeveloped, any parking provided would need to meet the current DCSM requirements.  While not eliminating all of the issues, the applicant plans to remove the closest parking spaces off of Federal Street on each side of the parking lot to eliminate the ability for people to directly back into Federal Street. If they choose to do this, it would reduce the number of parking spaces to 20.

*Proffers*

The applicant has offered the following proffers (written verbatim):

1.  Drive-through facilities are prohibited.
2.  No parking lot (including travel lanes and drive aisles) shall be located between any building and South Main Street.
3.  All traffic generating uses shall be limited to a combined total of 100 vehicle trips in either the AM or PM peak hour as calculated using the latest edition of the Institute of Transportation Engineer's Trip Generation Manual unless the property owner first, at their cost: (1) completes a Traffic Impact Analysis approved by the City Department of Public Works and (2) implements all identified mitigation measures or improvements. The City Department of Public Works may, in its sole discretion, waive, in whole or in part, completion of a Traffic Impact Analysis or any identified mitigation measures or improvements.

*Land Use*

The Comprehensive Plan designates this site as Mixed Use and states:

> The Mixed Use category includes both existing and proposed areas for mixed use. Mixed Use areas shown on the Land Use Guide map are intended to combine residential and non-residential uses in neighborhoods, where the different uses are finely mixed instead of separated. Mixed Use can take the form of a single building, a single parcel, a city block, or entire neighborhoods. Quality architectural design features and strategic placement of green spaces for large scale developments will ensure development compatibility of a mixed use neighborhood with the surrounding area. These areas are prime candidates for "live-work" and traditional neighborhood developments (TND). Live-work developments combine residential and commercial uses allowing people to both live and work in the same area. The scale and massing of buildings is an important

consideration when developing in Mixed Use areas. Commercial uses would be expected to have an intensity equivalent to a Floor Area Ratio of at least 0.4, although the City does not measure commercial intensity in that way. Downtown is an existing area that exhibits and is planned to continue to contain a mix of land uses.

The downtown Mixed Use area often has no maximum residential density, however, development should take into consideration the services and resources that are available (such as off-street parking) and plan accordingly. Residential density in Mixed Use areas outside of downtown should be around 24 dwelling units per acre, and all types of residential units are permitted: single-family detached, single-family attached (duplexes and townhomes), and multi-family buildings. Large scale developments, which include multi-family buildings are encouraged to include single-family detached and/or attached dwellings.

As noted above, the property is designated as Mixed Use in the Comprehensive Plan, which, among other things, is a designation that promotes "live-work" environments and traditional neighborhood development (TND). The Mixed Use designation description refers to TND, which is explained further in the Comprehensive Plan on page 6-9, and includes promoting walking, biking, and taking public transit. Proffers #1 and #2 promote pedestrian friendly design by prohibiting drive-throughs and restricting vehicle parking areas and drive isles from being located between buildings and South Main Street.

*Transportation and Traffic*

The Determination of Need for a Traffic Impact Analysis (TIA) form ("TIA determination form") for the proposed rezoning is attached. The TIA determination form indicated that the planned uses would not generate 100 or more new peak hour trips, which is the threshold for staff to require a TIA. Therefore, a TIA was not required for the rezoning request.

While the applicant is not planning to redevelop the site and is not anticipating a significant change in the use of the property,, it could redevelop in the future. Proffer #3 requires that any use shall not produce 100 or more new trips in the peak hours and if a proposed use were to generate more than 100 new trips, the applicant would need to complete a TIA and may need to construct street improvements.

*Public Water and Sanitary Sewer*

Staff has no concerns with the requested rezoning regarding water and sewer matters.

*Conclusion*

Staff believes that rezoning the property to B-1C with the submitted proffers generally conforms with the City's Comprehensive Plan and recommends approval of the rezoning.

Chair Baugh asked if there were any questions for staff.

Councilmember Dent said while I appreciate staff acknowledging and rectifying the order of not publishing the Public Notice, it just so happens, fortunately, that neither one of the projects that we have to have a do over for are really affected. This one is essentially bringing itself into compliance and the other one was going to have to come back to Planning Commission anyway. Nobody was itching to get their shovel in the ground. That was fortunate, and I appreciate staff's

transparency about all that.

Chair Baugh asked if there were any more questions for staff. Hearing none, he invited the applicant or applicant's representative to speak to their request.

Ed Price, representative, Elm Properties, LLC, came forward to speak to the request. We are just happy to be able to come back and also accept the approval that was done at the July 9 meeting and hope it goes through on this meeting also. We have had the building since 1960 in the family, and we are continuing in the same manner that they, my father and his partner, did. We do not have any plans to put a drive-through or anything else through it.

Chair Baugh asked if there were any questions for the applicant.

Vice Chair Porter said I just wanted to ask a quick question about the fact that you are looking to eliminate some of the current spaces to provide more space for turnarounds within the actual parking lot itself.

Mr. Price said yes, the last two spaces. We are waiting for signage to come in to designate a "no parking" area for turnaround purposes.

Vice Chair Porter said that makes it safer on Federal [Street], thank you.

Chair Baugh opened the public hearing and invited anyone in the room or on the phone wishing to speak to the request.

Panayotis Giannakouros, a City resident, called in to speak to the request. Short comment on this application, two comments actually.  One, a number of our elected and appointed bodies have been very enthusiastic about reducing parking minimums without thinking about what they are doing.  Now, in general, the business behind these questions, these parking minimums, comes from an ideological commitment to privatizing public spaces. I hope people will look into this and think about it and think about what that means. In this case, we have a better reason for reducing the minimums. As Commissioner Porter pointed out, a turning radius that is a potential public safety.  The idea that if we reduce parking minimums, it will change the incentives and then more people will ride bicycles. That is already  an ideologically loaded commitment to how human beings function. That is treating them as homo economists, rational optimizers. That is not how people work in society. Second, looking at the public purpose, the public hearings that were scheduled for these items are for the benefit of the public. We saw that in the upcoming item, the public had a strong interest in it. It was not the processes that we conduct are not for the benefit of the developers alone. Often, we get tunnel vision that everything is between the City staff, elected and appointed officials, and developers. We have 50,000 people who are affected by these decisions, and they do not have concentrated interests to be constantly following what is

going on. We, the people, need notice. These mistakes that were made with regard to notice, contrary to what Councilmember Dent said, [unintelligible], it is a fundamental fail. So, I hope that we will be able to cope with the bigger picture of people in the City.  I thank you so much for your time.

Chair Baugh closed the public hearing and opened the matter for discussion.

Vice Chair Porter said I will start by thanking the applicant for coming back a second time. I supported this the first time it came before Planning Commission. It seems like a common sense request. I will briefly speak to the parking issue. I think, in this particular case, it does make a lot of sense just because of the way the parking lot is currently configured. I will not get into the broader issues of reducing parking limits. I will say that I am always in favor of increased flexibility in terms of being able to make best use of the land and the opportunities that might come by reconfiguring those restrictions a lot of times have different factors to them. It is not always a simple case of simply reducing parking.

Commissioner Kettler said I do think that flexibility is also particularly helpful downtown where there is a much greater capacity for people to be walking and biking. If there is a lot of excessive parking that does tend to contribute to more traffic and making it less walkable and bikeable. The fact that the applicant is interested in some flexibility with that, I am happy to see. I am also happy to see that the first proffer, that no drive-through facilities will be permitted. I did not think that was particularly likely with the property, but drive-through facilities are a great way to introduce new conflict points particularly where there are a lot of people walking and [drive-through facilities] have no business being there. I appreciate seeing that as well.

Councilmember Dent said I think this is good creative use of the space that you have so thank you for that.

Vice Chair Porter said I will make a motion to recommend approval of the rezoning request. Councilmember Dent seconded the motion.

Chair Baugh called for a roll call vote.

| | |
|---|---|
| Commissioner Seitz | Aye |
| Councilmember Dent | Aye |
| Commissioner Alsindi | Aye |
| Commissioner Kettler | Aye |
| Vice Chair Porter | Aye |
| Chair Baugh | Aye |

The motion to recommend approval of the rezoning request passed (6-0). The recommendation will move forward to City Council on November 12, 2025.

**A motion was made by Porter, seconded by City Council Representative Dent, that this PH-Rezoning  be recommended for approval to the City Council, due back on 11/12/2025. The motion carried with a recorded roll call vote taken as follows:**

**Yes:** 6 -  Baugh, City Council Representative Dent, Alsindi, Porter, Kettler and Seitz

**No:** 0

| 4.c. | Consider a request from City of Harrisonburg to amend the Zoning Ordinance to add a new term "Inpatient Substance Use Disorder Treatment Facility" and other related changes |
|---|---|

Chair Baugh read the request and asked staff to review.

At this point in the meeting, Mr. Fletcher joined the meeting.

Ms. Dang said currently, inpatient substance use disorder treatment facility uses are allowed by right in the R-3, Medium Density Residential District within a broadly-categorized group of medical-related uses per Section 10-3-48.3 (10). Specifically, subsection (10) allows for the following by right: *"Hospitals, convalescent or nursing homes, funeral homes, medical offices and professional offices as defined by article F."* Staff is proposing to amend the Zoning Ordinance by defining "inpatient substance use disorder treatment facility" and separating it from other medical uses and only allowing it by special use permit (SUP) in both the R-3 district and the B-2, General Business District. Making these amendments would provide the community an opportunity to assess potential impacts of a desired location and how such the use could affect other community services.

The entirety of the proposed ZO amendment is provided within the attached document titled "Current Ordinance Reflecting Recommended Amendments." For ease of reference, the proposed definition of "inpatient substance use disorder treatment facility" is shown below:

> *Inpatient substance use disorder treatment facility:* A facility licensed by the Department of Behavioral Health and Developmental Services of the Commonwealth of Virginia that provides living, sleeping, and sanitation accommodation for substance use disorder treatment service delivered on a 24-hour per day basis in an alcohol or drug rehabilitation facility or an intermediate care facility.

If the ZO amendments are approved as currently drafted, individuals wanting to establish a new inpatient substance use disorder facility must receive City Council's approval of a SUP to locate on an R-3 or B-2 zoned property and would continue to not be permitted in any other zoning district.

On September 15, 2025, a building permit was filed for an inpatient substance use disorder treatment facility on property zoned R-3. Because the use is currently allowed by right, the applicant may gain vested rights to operate, making the facility a lawful nonconforming use if this ordinance amendment is adopted. A nonconforming use may continue to operate, but any future expansion of the facility would require a special use permit There are no other inpatient substance

use disorder treatment facilities in Harrisonburg.

Note that there are several outpatient substance use disorder treatment facilities operating in the City within the B-1 and B-2 districts. Outpatient substance use disorder treatment facilities are part-time programs that do not provide overnight services meaning that patients receive treatment while also being able to return home, to work, and/or school. At an inpatient substance use disorder treatment facility, patients stay at the treatment facility where they receive 24-hour support and care. Typical inpatient substance use disorder treatment programs run anywhere from several weeks to several months.

While drafting the amendments for inpatient substance use disorder treatment facilities, it was clear that further amendments were needed to the ZO. Thus, in addition to the aforementioned amendments, staff is proposing the following:

- To add a definition for "hospital" and, due to the intense nature of such a use, remove the ability to locate a hospital in the R-3 district and to only allow it by right within the B-2 district.
- To add a definition and create a new use for "institutional care facility"
- To add clarity and consistency with Virginia Code definitions by modifying the following existing ZO definitions: "Assisted Living Facility," "Family," "Nursing Home," and "Professional Offices."
- To change the term "Clinic" to "Medical clinic" and modify that definition. Along with amending the definition, changes would be made to allow medical clinics as a by right use in the R-6, Low Density Mixed Residential Planned Community District; the R-7, Medium Density Mixed Residential Planned Community District; the MX-U, Mixed Use Planned Community District; the B-1A, Local Business District; the B-1, Central Business District; and the R-P, Residential-Professional District (Overlay). Furthermore, the modification would add the ability for medical clinics by SUP in both the R-5, High Density Residential District and the M-1, General Industrial District.

If approved as presented, the list of uses permitted by right within Section 10-3-48.3 (10) of the R-3 district's regulations would be amended as follows:

~~Hospitals, convalescent or nursing homes,~~ <u>Assisted living facilities, institutional care facilities,</u> funeral homes, medical offices and professional offices as defined by article F.

Due to how the public notice for this request was described, at this time, the terminology "medical office" as shown above in Section 10-3-48.3 (10) will not be changed to "medical clinic" as is planned. If City Council approves the requested ZO amendments, then staff will initiate a new ZO amendment request to amend Section 10-3-48.3 (10) to state the following so that the use of the terminology "medical clinic" is consistent throughout the ZO:

Assisted living facilities, institutional care facilities, funeral homes, ~~medical offices~~ <u>medical</u>

clinics, and professional offices as defined by article F.

No changes are proposed to other district regulations including the other R-3 district, which is known as R-3, Multiple Dwelling Residential District. As indicated at the beginning of Article J., the R-3, Multiple Dwelling Residential District regulations are only applicable to multi-family developments with engineered comprehensive site plans approved before August 14, 2010.

If the proposed ZO amendments are approved, the table below summarizes in which zoning districts the aforementioned uses would be allowed and whether they are permitted by right or with an approved SUP.

[Refer to staff memorandum for table]

*Conclusion*

Staff believes that Planning Commission and City Council should consider inpatient substance use disorder treatment facilities on a case-by-case basis so that the location and potential impacts can be evaluated. Staff recommends approval of the Zoning Ordinance amendments as proposed.

Councilmember Dent said seems to me there might be a word missing, let me know if this is true. With the paragraph beginning "on September 15, 2025, a building permit" should that not be a "building permit application was filed."

Ms. Dang said yes that would be more clear. A building permit has not yet been issued.

Commissioner Seitz said you made the statement that no types of these facilities exist in the City currently. Would Community Services Board's Arbor House be classified as one of these facilities?

Ms. Dang said I reached out to them because I had that same question. As I understand it, and from talking with them and also checking on a Virginia Licensing website for such facilities, they do have an inpatient facility, but it is for mental health not substance use disorders. They also treat people for outpatient services for substance use disorders.

Commissioner Seitz said it is interesting because Augusta County is getting ready to put into place an expanded version of what Arbor House was ten years ago. I do not know if it would classify under this. I do know that it is in going into an industrial park, and yet there was still a lot of public comment about it.

Chair Baugh asked if there were any more questions for staff. Hearing none, he opened the public hearing and invited anyone in the room or on the phone wishing to speak to the request.

Panayotis Giannakouros, a City resident, called in to speak to the request. He said on this item, we have a question of magnitudes again. Something like this was raised with… I do not know if this will cover the same kind of treatment centers. I think that we should be concerned about, with uses like this, is the people who are treated should have full and equal dignity throughout the City. We should not be thinking about who is in these care centers. Something that could be an issue is that we now are potentially having an economic motive to use housing space in a certain way and we might want to think about the impact that this would have on the quantity of available housing. Now this relates to the moral panic that was stoked some time ago around short-term rentals. At

**Planning Commission** | **Meeting Minutes - Final** | **October 8, 2025**

the time, I testified, repeatedly, that there was no economic driver for them. Then outside consultants did a study and, lo and behold, we do not have a short-term rental problem. Just as I said we would not. In this case, we might consider the impact on the amount of housing. That should be what guides thinking about these properties and not, as one of the Commissioners pointed out, there should be strong push back against discrimination for the people being treated. So just that distinction and thinking about magnitudes is something that we have not been doing in the past, and I hope we will be doing better in the future. Thank you.

Chair Baugh closed the public hearing and opened the matter for discussion.

Vice Chair Porter said first of all I appreciate the proactivity of staff in bringing this forward. This is actually a circumstance where the staffs' actions are safeguarding the community's right to be able to speak out on these types of issues. If this were allowed as a by right circumstance, that would not be the case. I am an advocate for these types of treatment facilities and the fact that we need them in our community. There is not enough treatment available for people that have needs for this. However, I will also say that not all facilities are created equal. It could be a ten bed facility. It could be a hundred bed facility. It could have responsible discharge protocols that do not put people on the street that may have come here from another municipality with absolutely no plan for housing them. While others may have outstanding processes in place. Each center probably needs to be evaluated on its own merits, and this allows us to be able to do so.

Councilmember Dent said I agree with all that.

Commissioner Seitz made a motion to recommend approval of the Zoning Ordinance amendment.

Commissioner Alsindi seconded the motion.

Chair Baugh called for a roll call vote.

| | |
|---|---|
| Commissioner Seitz | Aye |
| Councilmember Dent | Aye |
| Commissioner Alsindi | Aye |
| Commissioner Kettler | Aye |
| Vice Chair Porter | Aye |
| Chair Baugh | Aye |

The motion to recommend approval of Zoning Ordinance Amendment passed (6-0). The recommendation will move forward to City Council on November 12, 2025.

**A motion was made by Seitz, seconded by Alsindi, that this PH-Zoning Ordinance be recommended for approval to the City Council, due back on 11/12/2025. The motion carried with a recorded roll call vote taken as follows:**

**Yes:** 6 - Baugh, City Council Representative Dent, Alsindi, Porter, Kettler and Seitz

**No:** 0

## 7.   Public Comment

Panayotis Giannakouros, a City resident, said it has come to my attention that the City, having an overabundance of important enforcement staff with nothing to do, has started Proactive Zoning Enforcement once again. Now, not to speak to any specific item that has already been talked about, I would like folks to sit with their favorability toward flexibility for developers who are going to commodify land and sell it for a profit or services in the private market and compare that to flexibility in living for people who are the point of any economy. Flexibility for people living in their homes. By restarting Proactive Zoning Enforcement, you are having a chill effect on how people can live in homes, how people can leave the land around them. The effects have already been felt. There has been killing of wildlife with the stated intent that the aesthetics of the golf course are more important than children getting to grow up seeing foxes and wild animals. The effects, I can tell you, in the entire neighborhood, people are now cutting things down and not giving themselves the flexibility to be a part of the ecological treasures and the biodiversity hotspots that we had been. This is a very negative turn of events, and I hope that Planning Commission will think on this flexibility for developers and think about flexibility for people who are having a hard time and who are housing stressed, or who have gifts to bring to this community and who are being suppressed by these simple-minded rules that were intended to marginalize people. Thank you.

## 8.   Report of Secretary & Committees

### 8.a.  Rockingham County Planning Commission Liaison Report

Chair Baugh reported on the October 7, 2025, Rockingham County Planning Commission meeting. The following items were on the agenda:

- Public hearing for a request from Christopher Dove to rezone (Tax Map # 115-A-13) 1.175 acres from R-2 (Medium Density Residential) to A-1 (Prime Agricultural) - recommended approval
- Zoning Ordinance amendment to Chapter 17 (Zoning) of the Rockingham County Code related to the definition of Dwelling, live/work, create supplemental standards for Mixed Use Structure, and the land use, zoning table for the uses of Dwelling, live/work and Mixed Use Structure, and create parking requirements for Mixed Use Structure. -recommended approval

**Planning Commission**    **Meeting Minutes - Final**    **October 8, 2025**

**8.b.  City Council Report**

Councilmember Dent reported there were no items from Planning Commission that were presented to City Council. On September 23, there was a report and no action on The Link Apartments rezoning (various addresses on South Main Street and South Liberty Street). The applicant's representative gave a brief report that they were just about to nail down the facilitated process. The City was launching the process to connect the applicant with facilitators. It is now in the applicant's hands.

## 9.    Other Matters

Councilmember Dent said I would like to acknowledge a couple of young leaders I met the other day at the JMU event for the Young Southeast Asian Leaders Initiative (YSEALI) Academic Fellows Program. We have Dia from Indonesia and Kai from Brunei. They were interested in Urban Planning, so I said come to Planning Commission. Great education for them to take back to their respective countries.

Chair Baugh said welcome.

### 9.a.  Review Summary of next month's applications

Ms. Dang said we have two items coming up on the agenda. We have a rezoning on Chicago Avenue and then a Zoning Ordinance Amendment related to setbacks in the R-8 district. We recommend one meeting for the month of November. As a reminder, because of the Veterans' Day holiday pushing the council meeting from Tuesday to Wednesday, November 12, the Planning Commission meeting is going to be bumped to Thursday, November 13. We will start at the same time of 6:00 p.m. We will also move our site tour to Wednesday at 4:00 p.m.

## 10.    Adjourment

The meeting adjourned at 7:00 p.m.

NOTE TO THE PUBLIC

Staff will be available at 4:00 p.m. on the Wednesday before the next Planning Commission meeting for those interested in going on a field trip to view the sites on the next agenda.

INTERPRETATION SERVICES

Planning Commission                    **Meeting Minutes - Final**                    October 8, 2025

Language interpretation service in Spanish, Arabic and Kurdish is available for Planning Commission meetings. To ensure that interpreters are available at the meeting, interested persons must request the accommodation at least four (4) calendar days in advance of the meeting by contacting the City Clerk at (540) 432-7701 or by submitting a request online at: www.harrisonburgva.gov/interpreter-request-form

El servicio de intérpretes inglés-español está disponible para las reuniones públicas de la Comisión de Planificación. Para asegurar la disponibilidad de intérpretes, cualquier interesado deberá solicitar la presencia de un intérprete al menos cuatro (4) días calendarios antes de la reunión comunicándose con la Secretaría Municipal al (540) 432-7701 o por medio de la página por internet al:

https://www.harrisonburgva.gov/interpreter-request-form

NOTE TO THE PUBLIC

Residents/Media will be able to attend the meeting.

The Public can also view the meeting live on:

- The City's website, https://harrisonburg-va.legistar.com/Calendar.aspx
- Public Education Government Channel 3 and Channel 1084

A phone line will also be live where residents will be allowed to call in and speak with Planning Commission during the Public Hearings and the Public Comments portion of the night's meeting.   We ask those that wish to speak during the public comment period to not call in until after all the public hearings and public comment on those have been heard.  This will avoid anyone calling on any other item from holding up the queue and then being asked to call back at a later time.

The telephone number to call in is:  (540) 437-2687

Residents also may provide comment prior to the meeting by visiting this page: www.harrisonburgva.gov/agenda-comments



October 8, 2025 Planning Commission Meeting

**Title**
Zoning Ordinance Amendment, Inpatient Substance Use Disorder Treatment Facility, Hospitals, and Other Related Terms — Thanh Dang, Community Development

**Summary**

| | |
|---|---|
| Zoning Ordinance Sections | Amend Sections 10-3-24, 10-3-48.3, 10-3-48.4, 10-3-55.4, 10-3-56.3, 10-3-57.3, 10-3-58.4, 10-3-78, 10-3-84, 10-3-90, 10-3-91, 10-3-97, and 10-3-186 |
| Purpose | • To add a new term and definition for a use known as an "Inpatient Substance Use Disorder Treatment Facility" (referred in public notices as Inpatient Substance Abuse Treatment Facility) and to allow it by special use permit in both the R-3, Medium Density Residential District and B-2, General Business District.<br>• To add a definition for "Hospitals" and to allow it by right in the B-2, General Business District.<br>• To make amendments to other related terms.<br>• To amend zoning district regulations to reflect new and amended terms. |
| Applicant | City of Harrisonburg |
| Planning Commission | October 8, 2025 (Public Hearing) |
| City Council | Anticipated November 12, 2025 (First Reading/Public Hearing)<br>Anticipated November 25, 2025 (Second Reading) |

**Recommendation**
Option 1. Recommend approval of the Zoning Ordinance amendments.

**Fiscal Impact**
N/A

**Context & Analysis**
Currently, inpatient substance use disorder treatment facility uses are allowed by right in the R-3, Medium Density Residential District within a broadly-categorized group of medical-related uses per Section 10-3-48.3 (10). Specifically, subsection (10) allows for the following by right: *"Hospitals, convalescent or nursing homes, funeral homes, medical offices and professional*

*offices as defined by article F."* Staff is proposing to amend the Zoning Ordinance by defining "inpatient substance use disorder treatment facility" and separating it from other medical uses and only allowing it by special use permit (SUP) in both the R-3 district and the B-2, General Business District. Making these amendments would provide the community an opportunity to assess potential impacts of a desired location and how such the use could affect other community services.

The entirety of the proposed ZO amendment is provided within the attached document titled "Current Ordinance Reflecting Recommended Amendments." For ease of reference, the proposed definition of "inpatient substance use disorder treatment facility" is shown below:

> *Inpatient substance use disorder treatment facility:* A facility licensed by the Department of Behavioral Health and Developmental Services of the Commonwealth of Virginia that provides living, sleeping, and sanitation accommodation for substance use disorder treatment service delivered on a 24-hour per day basis in an alcohol or drug rehabilitation facility or an intermediate care facility.

If the ZO amendments are approved as currently drafted, individuals wanting to establish a new inpatient substance use disorder facility must receive City Council's approval of a SUP to locate on an R-3 or B-2 zoned property and would continue to not be permitted in any other zoning district.

On September 15, 2025, a building permit was filed for an inpatient substance use disorder treatment facility on property zoned R-3. Because the use is currently allowed by right, the applicant may gain vested rights to operate, making the facility a lawful nonconforming use if this ordinance amendment is adopted. A nonconforming use may continue to operate, but any future expansion of the facility would require a special use permit There are no other inpatient substance use disorder treatment facilities in Harrisonburg.

Note that there are several outpatient substance use disorder treatment facilities operating in the City within the B-1 and B-2 districts. Outpatient substance use disorder treatment facilities are part-time programs that do not provide overnight services meaning that patients receive treatment while also being able to return home, to work, and/or school. At an inpatient substance use disorder treatment facility, patients stay at the treatment facility where they receive 24-hour support and care. Typical inpatient substance use disorder treatment programs run anywhere from several weeks to several months.

While drafting the amendments for inpatient substance use disorder treatment facilities, it was clear that further amendments were needed to the ZO. Thus, in addition to the aforementioned amendments, staff is proposing the following:
- To add a definition for "hospital" and, due to the intense nature of such a use, remove the ability to locate a hospital in the R-3 district and to only allow it by right within the B-2 district.
- To add a definition and create a new use for "institutional care facility"

2

- To add clarity and consistency with Virginia Code definitions by modifying the following existing ZO definitions: "Assisted Living Facility,"[1] "Family," "Nursing Home,"[2] and "Professional Offices."
- To change the term "Clinic" to "Medical clinic" and modify that definition. Along with amending the definition, changes would be made to allow medical clinics as a by right use in the R-6, Low Density Mixed Residential Planned Community District; the R-7, Medium Density Mixed Residential Planned Community District; the MX-U, Mixed Use Planned Community District; the B-1A, Local Business District; the B-1, Central Business District; and the R-P, Residential-Professional District (Overlay). Furthermore, the modification would add the ability for medical clinics by SUP in both the R-5, High Density Residential District and the M-1, General Industrial District.

If approved as presented, the list of uses permitted by right within Section 10-3-48.3 (10) of the R-3 district's regulations would be amended as follows:

> ~~Hospitals, convalescent or nursing homes,~~ <u>Assisted living facilities, institutional care facilities,</u> funeral homes, medical offices and professional offices as defined by article F.

Due to how the public notice for this request was described, at this time, the terminology "medical office" as shown above in Section 10-3-48.3 (10) will not be changed to "medical clinic" as is planned. If City Council approves the requested ZO amendments, then staff will initiate a new ZO amendment request to amend Section 10-3-48.3 (10) to state the following so that the use of the terminology "medical clinic" is consistent throughout the ZO:

> Assisted living facilities, institutional care facilities, funeral homes, ~~medical offices~~ <u>medical clinics,</u> and professional offices as defined by article F.

No changes are proposed to other district regulations including the other R-3 district, which is known as R-3, Multiple Dwelling Residential District. As indicated at the beginning of Article J., the R-3, Multiple Dwelling Residential District regulations are only applicable to multi-family developments with engineered comprehensive site plans approved before August 14, 2010.

---

[1] Assisted living facility, https://law.lis.virginia.gov/admincode/title22/agency40/chapter73/section10/ and https://www.dss.virginia.gov/facility/alf.cgi.

[2] Nursing home, https://law.lis.virginia.gov/vacode/32.1-123/ and https://www.vdh.virginia.gov/licensure-and-certification/division-of-long-term-care-services/

3

If the proposed ZO amendments are approved, the table below summarizes in which zoning districts the aforementioned uses would be allowed and whether they are permitted by right or with an approved SUP.

| | R-1, R-2, R-4, R-8, UR | R-3, Medium | R-5 | R-6 & R-7 | UR with R-P overlay | MX-U & B-1A | B-1 | B-2 | M-1 |
|---|---|---|---|---|---|---|---|---|---|
| **Assisted living facility** | - | by right | - | - | - | - | - | - | - |
| **Hospital** | - | - | - | - | - | - | - | by right | - |
| **Inpatient substance use disorder treatment facility** | - | SUP | - | - | - | - | - | SUP | - |
| **Institutional care facility** | - | by right | - | - | - | - | - | - | - |
| **Medical clinic/ Medical office** | - | by right | SUP | by right | by right | by right | by right | by right | SUP |
| **Professional office** | - | by right | SUP | by right | by right | by right | by right | by right | SUP |

*Conclusion*
Staff believes that Planning Commission and City Council should consider inpatient substance use disorder treatment facilities on a case-by-case basis so that the location and potential impacts can be evaluated. Staff recommends approval of the Zoning Ordinance amendments as proposed.

**Options**
1. Recommend approval of the Zoning Ordinance amendments.
2. Recommend approval of the Zoning Ordinance amendments with modifications.
3. Recommend denial of the Zoning Ordinance amendments.

**Attachments**
- Current Ordinance Reflecting Recommended Amendments

4